**1114**

SIERRA CLUB, Petitioner,

v.

ENVIRONMENTAL PROTECTION
AGENCY et al., Respondents,

The Dayton Power & Light Co. et
al., Intervenors.

SIERRA CLUB et al., Petitioners,

v.

ENVIRONMENTAL PROTECTION
AGENCY et al., Respondents.

PUBLIC SERVICE COMPANY OF
COLORADO et al., Petitioners,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, Respondent,

Sierra Club et al., Intervenors.

UTAH POWER & LIGHT COMPANY,
Petitioner,

v.

ENVIRONMENTAL PROTECTION
AGENCY, Respondent,

Sierra Club et al., Intervenors.

STATE OF NEW MEXICO ex rel. NEW
MEXICO ENVIRONMENTAL IM-
PROVEMENT AGENCY, Petitioner,

v.

ENVIRONMENTAL PROTECTION
AGENCY, Respondent,

Sierra Club et al., Intervenors.

PACIFIC COAL GASIFICATION
COMPANY et al., Petitioners,

v.

ENVIRONMENTAL PROTECTION
AGENCY, Respondent,

Sierra Club et al., Intervenors.

UTAH INTERNATIONAL, INC.,
Petitioner,

v.

ENVIRONMENTAL PROTECTION
AGENCY, Respondent,

Sierra Club et al., Intervenors.

INDIANA–KENTUCKY ELECTRIC
CORPORATION et al., Petitioners,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, Respondent,

Sierra Club et al., Intervenors.

The DAYTON POWER & LIGHT
COMPANY et al., Petitioners,

v.

ENVIRONMENTAL PROTECTION
AGENCY, Respondent,

Sierra Club et al., Intervenors.

BUCKEYE POWER, INC. et
al., Petitioners,

v.

ENVIRONMENTAL PROTECTION
AGENCY et al., Respondents,

Sierra Club et al., Intervenors.

AMERICAN PETROLEUM INSTITUTE
et al., Petitioners,

v.

ENVIRONMENTAL PROTECTION
AGENCY, Respondent,

Sierra Club et al., Intervenors.

ALABAMA POWER COMPANY et
al., Petitioners,

v.

ENVIRONMENTAL PROTECTION
AGENCY, Respondent,

Sierra Club et al., Intervenors.

MONTANA POWER COMPANY et
al., Petitioners,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, Respondent,

Sierra Club et al., Intervenors.

SALT RIVER PROJECT AGRICULTUR-
AL IMPROVEMENT AND POWER
DISTRICT et al., Petitioners,

v.

ENVIRONMENTAL PROTECTION
AGENCY et al., Respondents,

Sierra Club et al., Intervenors.

Nos. 74–2063, 74–2079, 75–1368 to 75–1372, 75–1575, 75–1663 to 75–1666, 75–1763 and 75–1764.

United States Court of Appeals, District of Columbia Circuit.

Argued June 9, 1976.

Decided Aug. 2, 1976.

Petitions for Review of Regulations Promulgated by the Environmental Protection Agency.

Bruce J. Terris, Washington, D. C., with whom Nathalie V. Black, Washington, D. C., John D. Hoffman, San Francisco, Cal., and H. Anthony Ruckel, Denver, Colo., were on the brief, for petitioners in Nos. 74–2063 and 74–2079 and intervenors Sierra Club and others.

Henry Charles Griego, Santa Fe, N. M., for petitioner in No. 75–1370. Toney Anaya, Atty. Gen. of the State of New Mexico, and Robert A. Engel, Sp. Asst. Atty. Gen., New Mexico Environmental Improvement Agency, Santa Fe, N. M., were on the brief for petitioner in No. 75–1370.

John J. Adams, Richmond, Va., with whom Joseph C. Carter, Jr. and David F. Peters, Richmond, Va., were on the brief, for petitioners in No. 75–1665; also entered an appearance for intervenors American Petroleum Institute and others in No. 75–1663.

Gerry Levenberg, Washington, D. C., with whom Carl B. Nelson, Jr., Washington, D. C., Sidney G. Baucom and Verl R. Topham, Salt Lake City, Utah, and Girts Krumins, Denver, Colo., were on the brief, for petitioners in Nos. 75–1368 and 75–1369; also entered an appearance for intervenor Utah Power & Light Co. in No. 74–2063.

Francis M. Shea, Washington, D. C., with whom Richard T. Conway, David Booth Beers, and James R. Bieke, Washington, D. C., and Michael J. Ruffatto, Bruce Norton, and Jon L. Kyl, Phoenix, Ariz., were on the brief, for petitioners in Nos. 75–1763 and 75–1764.

Richard J. Denny, Jr., Asst. Gen. Counsel, Environmental Protection Agency, and Erica L. Dolgin, Atty., Dept. of Justice, Washington, D. C., with whom Peter R. Taft, Asst. Atty. Gen., Robert V. Zenner, Gen. Counsel, Environmental Protection Agency, and Edmund B. Clark and Earl Salo, Attys., Dept. of Justice, Washington, D. C., were on the brief, for respondents. Wallace H. Johnson, Asst. Atty. Gen., Washington, D. C., at the time the record was filed, also entered an appearance for respondents.

James W. McCartney and Norman D. Radford, Jr., Houston, Tex., and K. R. Edsall and Jane C. L. Goichman, Los Angeles, Cal., were on the brief for petitioners in No. 75–1371.

C. C. Dietrich and Robert M. Westberg, San Francisco, Cal., and Richard N. Carpenter, New York City, were on the brief for petitioner in No. 75–1372.

Jerry P. Belknap, Jon D. Noland, and Bryan G. Tabler, Indianapolis, Ind., were on the brief for petitioners in No. 75–1575. Fred P. Bamberger, Evansville, Ind., also entered an appearance for petitioners in No. 75–1575.

Wilson W. Snyder, Toledo, Ohio, was on the brief for petitioners in Nos. 75–1663 and 75–1664. Harry H. Voigt, Henry V. Nickel, Eugene R. Fidell, and Edward L. Cohen, Washington, D. C., also entered appearances for petitioners in Nos. 75–1663 and 75–1664.

John P. Scott, Jr., Birmingham, Ala., Eugene T. Holmes, Atlanta, Ga., and Eaton A. Lang, Gulfport, Miss., were on the brief for petitioners in No. 75–1666.

Jon L. Kyl, Bruce Norton, and Michael J. Ruffatto, Phoenix, Ariz., were on the brief for intervenors Western Energy Supply and Transmission Associates and others in No. 74–2063.

Marilyn S. Kite, Laramie, Wyo., filed a brief on behalf of the States of Alabama, Colorado, Kansas, Minnesota, South Dakota, and Florida as *amici curiae*.

Nicholas C. Yost, San Francisco, Cal., and Edward L. Rogers, Augusta, Maine, filed a brief on behalf of the States of California and Maine as *amici curiae.*

Harry H. Voigt, Henry V. Nickel, and Eugene R. Fidell, Washington, D. C., entered appearances for intervenors The Dayton Power & Light Co. *et al.* in No. 74–2063.

Henry Brown, Washington, D. C., entered an appearance for intervenors Western Energy Supply and Transmission Associates and others in No. 74–2063.

Raphael Moses, Boulder, Colo., entered an appearance for petitioner Platte River Power Authority in No. 75–1368.

David Booth Beers, Washington, D. C., entered an appearance for petitioner Pacific Power & Light Co. in No. 75–1368.

Before WRIGHT, ROBINSON, and WILKEY, Circuit Judges.

Opinion for the court filed by J. SKELLY WRIGHT, Circuit Judge.

J. SKELLY WRIGHT, Circuit Judge:

## I. INTRODUCTION

One of the primary purposes of the Clean Air Act, 42 U.S.C. § 1857 *et seq.* (1970), is "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population * * *." Section 101(b)(1), 42 U.S.C. § 1857(b)(1). Pursuant to the court order in *Sierra Club v. Ruckelshaus,* 344 F.Supp. 253 (D. D.C.1972), aff'd per curiam, 4 ERC 1815 (D.C. Cir. 1972), aff'd by an equally divided Court, sub nom. *Fri v. Sierra Club,* 412 U.S. 541, 93 S.Ct. 2770, 37 L.Ed.2d 140 (1973), the Administrator of the Environmental Protection Agency (EPA) promulgated regulations designed to prevent "significant deterioration" of air quality in those areas which have air that already is cleaner than the national ambient air quality standards.[1]

---

1. The twin objectives of the Clean Air Act are to improve air quality where pollution levels do not meet national minimum standards, and to protect the quality of air that already, as in this case, is cleaner than national standards. *See* Part V–A of this opinion *infra.* Accomplishment of those objectives is to be a joint enterprise of the federal government and the states, the former providing informed guidance to the implementation efforts of the latter. *See* §§ 101(a)(3), (4) of the Act, 42 U.S.C. §§ 1857(a)(3), (4).

Section 108 of the Act, 42 U.S.C. § 1857c–3, required the Administrator of EPA to publish a list of air pollutants which have "an adverse effect on public health or welfare." The Administrator was then to promulgate national primary and secondary ambient air quality standards for those specified pollutants. National *primary* air quality standards are those "the attainment and maintenance of which * * * are requisite to protect the public health"; national *secondary* standards are those "requisite to protect the public welfare from any known or anticipated adverse effects associated with the presence of such air pollutant in the ambient air." Section 109, 42 U.S.C. § 1857c–4. The Administrator has promulgated national primary and secondary air quality standards for six pollutants: sulfur dioxide, particulate matter, carbon monoxide, photochemical oxidants, hydrocarbons, and nitrogen dioxide. 40 C.F.R. §§ 50.4–50.11 (1975).

The states are charged with the duty to develop implementation plans designed to achieve the level of air quality prescribed by the national primary and secondary standards:

Each State shall have the primary responsibility for assuring air quality within the entire geographic area comprising such State by submitting an implementation plan for such State which will specify the manner in which national primary and secondary ambient air quality standards will be achieved and maintained within each air quality control region in such State.

Section 107, 42 U.S.C. § 1857c–2. The plans are submitted to the Administrator for approval under the provisions of § 110 of the Act, 42 U.S.C. § 1857c–5 (1970), *as amended* (Supp. IV 1974). A proposed implementation plan must satisfy the requirements of § 110(a)(2)(A)–(H), 42 U.S.C. § 1857c–5(a)(2)(A)–(H), which requirements include attainment of the national primary standards within three years after approval of the plan, and attainment of the secondary standards within a "reasonable time." Section 110(a)(2)(A), 42 U.S.C. § 1857c–5(a)(2)(A).

Section 110 also provides that the Administrator is promptly to prepare and publish his own regulations for a state if (a) it fails to submit a plan, (b) the plan "is determined by the Administrator not to be in accordance with the requirements of this section," or (c) the state fails to revise its plan pursuant to a provision required by § 110(a)(2)(H). Section 110(c)(1), 42 U.S.C. § 1857c–5(c)(1) (Supp. IV 1974). Subsection (c)(1) of § 110 also contains a conditional hearing requirement for these "replacement" implementation plans: "If such

The regulations employ a classification scheme under which these "clean air" regions may be designated Class I, II, or III. All such areas initially are designated Class II, under which specified increments in sulfur dioxide and particulate matter pollution are considered "insignificant." A state, Indian territory, or federal land may be redesignated after hearing and by application to EPA. Designation as Class I implies a region of very clean air, in which relatively small increments in air pollution would be considered significant deterioration; Class III areas are those in which deterioration of air quality to the national ambient air quality standards would be considered insignificant.

The court has heard the regulations attacked from several perspectives. Petitioner Sierra Club contends that the regulations fail, in a variety of ways, to prevent significant deterioration of existing clean air. The States of New Mexico, Wyoming, and California[2] agree in some respects with Sierra Club, but are concerned that the regulations infringe on the general regulatory authority vested in the states by the Clean Air Act. A large number of electric power companies and industrial organizations have argued that the regulations are not authorized by the Clean Air Act, that their promulgation was procedurally defective, that the allowable increments are arbitrary and capricious, and that the regulatory structure created by the regulations is unconstitutional.

We conclude that the Administrator's action is rationally based and has not been shown to be either without his authority or unconstitutional. We therefore do not disturb the regulations as promulgated.

## II. LITIGATION HISTORY

Suit was filed in May 1972 by the Sierra Club and other environmental protection groups for a declaratory judgment that the Clean Air Act prohibited approval of state implementation plans which permitted significant deterioration of air cleaner than the national secondary standards, and for injunctive relief to prevent the Administrator from approving those portions of state implementation plans which would permit significant deterioration. District Judge John H. Pratt granted plaintiffs' motion for a preliminary injunction and declared invalid an EPA regulation[3] which had required only that state implementation plans "be adequate to prevent * * * ambient pollution levels from exceeding * * * [the applicable] secondary standard." *Sierra Club v. Ruckelshaus,* 344 F.Supp. 253 (D. D.C. 1972). The Administrator was enjoined from approving any state plan "unless he approves the state plan subject to, subsequent review by him to insure that it does not permit significant deterioration of existing air quality in any portion of any state where the existing air quality is better than one or more of the secondary standards promulgated by the Administrator."[4]

■ As is apparent from the provisions of the Clean Air Act outlined above,[5] prohi-

State held no public hearing associated with respect to such plan (or revision thereof), the Administrator shall provide opportunity for such hearing within such State on any proposed regulation." Subsection (a)(2)(H) requires that an implementation plan provide for revision (i) to take account of changes in either technology or the national standards and (ii) whenever the Administrator determines that the plan is inadequate to achieve the primary or secondary standards.

The basic structure described above is supplemented by § 111 of the Act, 42 U.S.C. § 1857c–6 (1970), *as amended* (Supp. IV 1974), which provides for promulgation of "standards of performance" for emission limitations of significant new sources of pollution, by categories of sources. The standards must reflect "the

degree of emission limitation achievable through the application of the best system of emission reduction which (taking into account the cost of achieving such reduction) the Administrator determines has been adequately demonstrated."

2. The three named states are joined by Maine, Alabama, Colorado, Kansas, Minnesota, South Dakota, and Florida.

3. 40 C.F.R. § 51.12(b) (1975).

4. *Sierra Club v. Ruckelshaus,* Civil Action No. 1031–72 (D. D.C. May 30, 1972), JA Vol. IV at 1487.

5. *See* note 1 *supra.*

bition of significant deterioration of air cleaner than the national standards is not an express requirement of the Act. Judge Pratt based his decision, rather, on the "protect and enhance" language of Section 101(b)(1) of the Act and on the legislative history of both the Clean Air Act of 1970 and the Air Quality Act of 1967.[6] The decision was affirmed *per curiam* by this court, 4 E.R.C. 1815 (1972), and was affirmed by an equally divided Supreme Court, *sub nom. Fri v. Sierra Club,* 412 U.S. 541, 93 S.Ct. 2770, 37 L.Ed.2d 140 (1973).

Pursuant to that order, the Administrator reviewed and disapproved all state plans insofar as they failed to provide for prevention of significant deterioration. 37 Fed. Reg. 22836 (November 9, 1971). Four alternative sets of regulations were proposed for public comment, in an effort to determine what meaning to give the concept of "significant deterioration."[7] Final regulations were published December 5, 1974, 39 Fed. Reg. 42509, and were amended slightly on January 16, 1975 (40 Fed.Reg. 2802), June 12, 1975 (40 Fed.Reg. 25004), and September 10, 1975 (40 Fed.Reg. 42011).

### III. THE REGULATIONS

In promulgating final regulations[8] EPA was concerned primarily with the meaning of "significant deterioration." As it stated in the discussion preceding the new regulations:

> Most of the comments implicitly recognized that there is a need to develop resources in presently clean areas of the country, and that significant deterioration regulations should not preclude all growth, but should ensure that growth occurs in an environmentally acceptable manner. However, there are some areas, such as national parks, where any deterioration would probably be viewed as significant. A single nationwide deterioration increment would not be able to accommodate these two situations.

39 Fed.Reg. at 42520. The solution was to prescribe, for those areas with air cleaner than the national standards, three classes of allowable total increments above the levels of particulate matter and sulfur dioxide pollution as of January 1, 1975, with the intention that each area could determine which class would prevent significant deterioration of its air in light of the area's air quality and social and economic needs and objectives:

> Class I applie[s] to areas in which practically any change in air quality would be considered significant; Class II applie[s] to areas in which deterioration normally accompanying moderate well-controlled growth would be considered insignificant;

---

**6.** The legislative history is discussed at notes 32–38 *infra.*

**7.** 38 Fed.Reg. 18986 (July 16, 1973). In proposing alternative solutions, EPA posed for public debate the problem of how significant deterioration was to be defined:

> The basis for preventing significant deterioration * * * lies in a desire to protect aesthetic, scenic, and recreational values, particularly in rural areas, and in concern that some air pollutants may have adverse effects that have not been documented in such a way as to permit their consideration in the formulation of national ambient air quality scientific data on the kind and extent of adverse effects of air pollution levels below the secondary standards, significant deterioration must necessarily be defined without a direct quantitative relationship to specific adverse effects on public health and welfare.
>
> *       *       *       *       *       *

> The relative significance of air quality versus economic growth may be a variable dependent upon regional conditions. For example, relatively minor deterioration of the aesthetic quality of the air may be very significant in a recreational area in which great pride (and economic development) is derived from the "clean air." Conversely, in areas with severe unemployment and little recreational value, the same level of deterioration might very well be considered "insignificant" in comparison to the favorable impact of new industrial growth with resultant employment and other economic opportunities. Accordingly, the definition of what constitutes significant deterioration must be accomplished in a manner to minimize the imposition of inequitable regulations on different segments of the Nation.

*Id.* at 18987, 18988.

**8.** Prevention of Significant Air Quality Deterioration," 39 Fed.Reg. 42510 (Dec. 5, 1974).

and Class III applie[s] to those areas in which deterioration up to the national standards would be considered insignificant.

\* \* \* \* \* \*

Since the consideration of "air quality factors" alone essentially leads to an arbitrary definition of what is "significant," this term only has meaning when the economic and social implications are analyzed and considered. Therefore, the Administrator believes that it is most important to recognize and consider these implications, since the consideration of air quality factors alone provides no basis for selecting one deterioration increment over another.

*Id.* The regulations, 40 C.F.R. §§ 52.01(d), (f), and 52.21 (1975), were promulgated as amendments to the disapproved state implementation plans.[9]

All areas initially are designated Class II,[10] and may be redesignated by proposal of a state, federal land manager, or Indian governing body where the state has not assumed jurisdiction over Indian lands.[11] Federal land may be designated only to a more restrictive classification than that provided by the state(s) in which it is located.[12]

A state may redesignate if a hearing is held after notice to states, federal land managers, and Indian governing bodies that may be affected,[13] and if the proposed redesignation is based on the record of the hearing,

which must reflect the basis for the proposed redesignation, including consideration of (1) growth anticipated in the area, (2) the social, environmental, and economic effects of such redesignation upon other areas and States, and (3) any impacts of such proposed redesignation upon regional or national interests.[14]

A redesignation is to be approved if the state has complied with the listed requirements, has not "arbitrarily and capriciously disregarded" the considerations listed in the passage quoted above, and has undertaken the new source review requirements of Sections 52.21(d) and (e), discussed below.[15]  40 C.F.R. § 52.21(c)(3)(vi)(*a*) (1975).[16]  Federal land managers and Indian governing bodies are subject to requirements parallel to those imposed on the states, with the added requirement that they consult with the state(s) in which they are located.[17]

If an area is designated as Class I or II, the allowable incremental pollution is measured from January 1, 1975.[18]  No incre-

---

9. Part 52 of 40 C.F.R. "sets forth the Administrator's approval and disapproval of State plans and the Administrator's promulgation of such plans or portions thereof." 40 C.F.R. § 52.02(a) (1975). Each state implementation plan has been amended to incorporate by reference the new regulations. *See, e. g.,* 40 C.F.R. §§ 52.96 (Alaska), 52.144 (Arizona), 52.181 (Arkansas).

10. 40 C.F.R. § 52.21(c)(3)(i) (1975).

11. 40 C.F.R. §§ 52.21(c)(3)(ii), (iii), (iv), (v) (1975).

12. 40 C.F.R. § 52.21(c)(iv) (1975).

13. 40 C.F.R. §§ 52.21(c)(3)(ii)(*a*)–(*c*) (1975).

14. 40 C.F.R. § 52.21(c)(3)(ii)(*d*) (1975).

15. *See* discussion at notes 20–23 *infra.*

16. In the event of a protest by a state or Indian governing body to a redesignation proposed by another state, federal land manager, or Indian governing body, the Administrator may approve the proposal "only if he determines that

in his judgment the redesignation appropriately balances considerations of growth anticipated in the area proposed to be redesignated; the social, environmental and economic effects of such redesignation upon the area being redesignated and upon other areas and States; and any impacts upon regional or national interests." 40 C.F.R. § 52.21(c)(3)(vi)(*e*) (1975).

17. 40 C.F.R. §§ 52.21(c)(3)(iv), (v) (1975).

18. 40 C.F.R. § 52.21(c)(2)(i) (1975). The increments are prescribed in the following table, included in the cited subsection:

| Pollutant | Class I (ug/m³) | Class II |
|---|---|---|
| Particulate matter: | | |
| Annual geometric mean | 5 | 10 |
| 24-hr. maximum | 10 | 30 |
| Sulfur dioxide: | | |
| Annual arithmetic mean | 2 | 15 |
| 24-hr. maximum | 5 | 100 |
| 3-hr. maximum | 25 | 700 |

ments are specified for Class III; areas so designated are required to meet only the national secondary standards.[19]

Enforcement of the limitation on incremental pollution is accomplished partly through preconstruction review of 19 categories of stationary sources considered to be significant sources of pollution.[20] Permission to construct or to modify significantly one of the listed stationary sources is conditioned on a showing that the source's emissions, together with all other increases or decreases in emissions in the area since January 1, 1975, will not violate the air quality increments applicable to *any* area.[21] The source also must meet an emission limit, specified by the Administrator, "which represents that level of emission reduction which would be achieved by the application of best available control technology, as defined in § 52.01(f), for particulate matter and sulfur dioxide."[22] Preconstruction review of new proposed sources will be conducted by the Administrator or, by delegation, by the individual states.[23]

Last, it should be noted that the described classification scheme is no procrustean bed to which all states are to be bound. The states retain the option of proposing an alternative method of preventing significant deterioration of air quality, thereby abandoning the regulatory framework described by the regulations under review. As EPA stated in proposing regulations:

> The State plans need not be identical to the regulations proposed herein, but should be developed to accommodate more appropriately individual conditions and procedures unique to specific State and local areas. States are urged to develop and submit individual plans as revisions to State Implementation Plans as soon as possible. When individual State Implementation Plan revisions are approved as adequate to prevent significant deterioration of air quality, the applicability of the regulations proposed herein will be withdrawn for that State.

39 Fed. Reg. at 31000 (August 27, 1974).

## IV. STANDARD OF REVIEW

■ It is well settled that EPA rulemaking is reviewed under Section 10 of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)–(D) (1970). *Ethyl Corp. v. EPA*, 176 U.S.App.D.C. ——, —— – ——, 541 F.2d 1, 33–37 (No. 73–2205, decided March 19, 1976). We must determine whether the Agency's action, findings, and conclusions are invalid as procedurally defective (§ 706(2)(D)), in excess of legislative authority (§ 706(2)(C)), unconstitutional (§ 706(2)(B)), or "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" (§ 706(2)(A)).

■ The "arbitrary and capricious" standard requires that agency action be affirmed if a rational basis exists therefor[24]; it is not for us to inquire into whether the decision is wise as a matter of policy, for that is left to the discretion and developed expertise of the agency.[25] The Supreme Court has cautioned, with respect to review under the "arbitrary and capricious" standard, that the reviewing court is limited to

**19.** 40 C.F.R. § 52.21(c)(2)(ii) (1975).

**20.** 40 C.F.R. § 52.21(d)(1)(i)–(xix) (1975).

**21.** 40 C.F.R. § 52.21(d)(2)(i) (1975), *as amended,* 40 Fed.Reg. 42011 (Sept. 10, 1975).

**22.** 40 C.F.R. § 52.21(d)(2)(ii) (1975). "Best available control technology" is defined as equivalent to the new source performance standards promulgated under § 111 of the Clean Air Act, 42 U.S.C. § 1857c–6. *See* discussion at note 1 *supra.* If no standard of performance has been promulgated for a source, best available control technology is determined on a case-by-case basis. 40 C.F.R. § 52.01(f) (1975).

**23.** 40 C.F.R. § 52.21(f) (1975). *See also* 40 C.F.R. § 52.21(d)(4) (1975), which provides for cooperation between the Administrator and federal land managers for review of new sources on federal land, and between the Administrator and the Secretary of the Interior as to lands over which a state has not assumed jurisdiction.

**24.** *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 290, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974).

**25.** *National Ass'n of Food Chains, Inc. v. ICC,* 175 U.S.App.D.C. 346, 352, 535 F.2d 1308, 1314 (1976) (*per curiam*).

deciding whether there has been a "clear error of judgment * * *. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1972). *See Ethyl Corp. v. EPA, supra,* 176 U.S.App.D.C. at —— n. 74, 541 F.2d at 34 n.74.

We therefore must assure ourselves that the Agency has presented a rational basis for its decision [26]; that it "demonstrably has given reasoned consideration to the issues, and has reached a result which rationally flows from its conclusions." [27]

### V. ARGUMENT

**A. Should *Sierra Club v. Ruckelshaus* be rejected on further consideration?**

■ The question whether the Clean Air Act should be interpreted to prohibit significant deterioration of air cleaner than the national standards is necessarily the first level of analysis. Although this issue was decided by the earlier *Sierra Club v. Ruckelshaus* litigation, it is contended by the industrial petitioners (1) that the decision was clearly wrong on the merits and should be reconsidered, and (2) that the later decision in *Train v. NRDC,* 421 U.S. 60, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975), and enactment of the Energy Supply and Environmental Coordination Act of 1974, 88 Stat. 246, are inconsistent with the prior decision in *Sierra Club v. Ruckelshaus.*

■ The first argument obviously would require the clearest showing that *Sierra Club v. Ruckelshaus* was incorrectly decided, since Judge Pratt's decision was affirmed by both another panel of this court and an equally divided Supreme Court. It is posited that neither the "protect and enhance" language of Section 101(b)(1) nor the legislative history of the Clean Air Act need be read to impose a requirement of nondeterioration; petitioners then point out that, to the contrary, a 1970 amendment to the Act, Section 110(a)(2), 42 U.S.C. § 1857c–5(a)(2), states that the Administrator "shall approve" a state implementation plan which meets the criteria listed in that section, none of which implies a nondeterioration standard. The conclusion advanced by petitioners is that the judicially-created requirement of nondeterioration violates this plain language of the 1970 amendment.

■ When a specific provision of a total statutory scheme reasonably may be construed to be in conflict with the congressional purpose expressed in the act, our first task is to examine the act's legislative history to determine whether the specific provision is reconcilable and consistent with the intent of Congress.[28] We find, in the legislative history of the Clean Air Act of 1970, a clear understanding that the Act embodied a pre-existing policy of nondeterioration of air cleaner than the national standards. Inasmuch as we find no support for the proposition that the addition of Section 110(a)(2) was intended to limit that policy in any way, we reaffirm our prior holding in *Sierra Club v. Ruckelshaus.*

The "protect and enhance" language of the Clear Air Act was added by the Air Quality Act of 1967, 81 Stat. 485.[29] The administrative interpretation and, to a less-

---

**26.** We note that the basis of agency action must be provided *by the agency*; an order "cannot be upheld merely because findings might have been made and considerations disclosed which would justify its order as an appropriate safeguard for the interests protected by the Act. There must be such a responsible finding * * *." *SEC v. Chenery Corp.,* 318 U.S. 80, 94, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943); *see National Ass'n of Food Chains, Inc. v. ICC, supra* note 25, 175 U.S.App.D.C. at 352, 535 F.2d at 1314.

**27.** *National Ass'n of Food Chains, Inc. v. ICC. supra* note 25, 175 U.S.App.D.C. at 353, 535 F.2d at 1315.

**28.** *See FTC v. Fred Meyer, Inc.,* 390 U.S. 341, 349, 88 S.Ct. 904, 908, 19 L.Ed.2d 1222 (1968): "[W]e cannot, in the absence of an unmistakable directive, construe the Act in a manner which runs counter to the broad goals which Congress intended it to effectuate."

**29.** *Air Quality Act of 1967,* S.Rep. No. 91–403, 90th Cong., 1st Sess. 40 (1967).

er degree, the legislative history of the Air Quality Act expressed a policy of nondeterioration,[30] and that policy appears generally to have been accepted at the time of the addition of the Clean Air Act amendments of 1970.

In the Senate hearings on the Clean Air Act amendments of 1970, the officials charged with implementation of the 1967 Act expressed their clear understanding that the "protect and enhance" language of Section 101 mandated the policy of nondeterioration. HEW Secretary Robert H. Finch testified as follows in a statement presented by Undersecretary John Veneman:

> In their implementation plans, the States would have to spell out the measures to be taken to achieve and preserve national air quality standards. As I have indicated, they would have the option of designing their implementation plans to achieve or preserve higher than national quality levels, if they wished to do so.
>
> As you know, one of the express purposes of the Clean Air Act is "to protect and enhance the quality of the Nation's air resources" * * *. Accordingly, it has been and will continue to be our view that implementation plans that would permit significant deterioration of air quality in any area would be in conflict with this provision. We shall continue to expect States to maintain air of good quality where it now exists.

**30.** *Sierra Club v. Ruckelshaus,* 344 F.Supp. 253, 255 (D. D.C.1972); Environmental Law Institute, Federal Environmental Law, 1974 at 1077–1080. The Senate Committee report on the Air Quality Act emphasized that the Act would apply to all areas of the country, and quoted Senator Muskie for the proposition that it was necessary "to assure the lessening of current levels of pollution and to prevent further environmental deterioration in the future." *Air Quality Act of 1967, supra* note 29, at 2–3, 8.

The Act was administered by the National Air Pollution Control Administration of the Department of Health, Education and Welfare, which formalized the concept of nondeterioration in its Guidelines for the Development of Air Quality Standards and Implementation Plans, Part I, § 1.51 at 7 (1969):

*Air Pollution—1970,* Hearings before the Subcommittee on Air and Water Pollution of the Senate Committee on Public Works, Part I, 132–133 (1970). Undersecretary Veneman went on to state that "[i]t will continue to be our view that implementation plans that would permit significant deterioration of air quality in any area would be in conflict with the provisions of the Act. We do not intend to condone 'backsliding.' If an area has air quality which is better than the national standards, they would be required to stay there and not pollute the air ever further, even though they may be below national standards." *Id.* at 143.

The Senate committee report gave express recognition to the concept of nondeterioration, directing that

> [*i*]n areas where current air pollution levels are already equal to, or better than, the air quality goals, the Secretary should not approve any implementation plan which does not provide, to the maximum extent practicable, for the continued maintenance of such ambient air quality. Once such national goals are established, deterioration of air quality should not be permitted except under circumstances where there is no available alternative.

S.Rep. No. 91–1196, 91st Cong., 2d Sess. 11 (1970) (emphasis added). Quite to the contrary, however, there was no particular significance ascribed to the "shall approve" language of the section which became Section 110(a)(2). *Id.* at 11–15.

> [A]n explicit purpose of the Act is "to *protect* and *enhance* the quality of the Nation's air resources" (emphasis added). Air quality standards which, even if fully implemented, would result in significant deterioration of air quality in any substantial portion of an air quality control region clearly would conflict with this expressed purpose of the law.

*See generally, Non-Degradation—Clean Air Act and Amendments Held to Mandate a Policy Prohibiting Significant Deterioration of Air Quality in Areas of Relatively Clean Air,* 2 Fordham Urban L.J. 136 (1973) (hereinafter *Clean Air Act Held to Prohibit Significant Deterioration*); *The Clean Air Act and the Concept of Non-Degradation: Sierra Club v. Ruckelshaus,* 2 Ecology L.Q. 801 (1971) (hereinafter *The Concept of Non-Degradation*).

The explanation of this omission in the legislative history appears to be that the 1970 amendments were aimed at states that refused to take action to improve their air quality. The background of the 1970 amendments was described in *Train v. NRDC, supra,* 421 U.S. at 64, 95 S.Ct. at 1474:

> The response of the States to these manifestations of increasing congressional concern with air pollution was disappointing. Even by 1970, state planning and implementation under the Air Quality Act of 1967 had made little progress. Congress reacted by taking a stick to the States in the form of the Clean Air Amendments of 1970 * * *.

The "stick" was the group of express requirements as to the content of state implementation plans.[31] The "shall approve" language was addressed to the administrative problems that would be caused by a requirement that all states submit complying implementation plans within a limited time; the provisions of Section 110(a) are, more than anything else, a summary of the mandatory requirements for all state implementation plans.[32] We have, however, found no indication, nor have we been cited to any indication in the legislative history, that Section 110 was intended in any way to vitiate the nondeterioration mandate contained in the Senate report.[33]

■ This court has recently cautioned that a failure by Congress expressly to reject the administrative construction of an act need not, without more, indicate congressional acquiescence in the agency interpretation.[34] In *Chisholm v. FCC,* 176 U.S. App.D.C. ——, 538 F.2d 349 (1976), the court refused to ascribe significance to congressional inaction when it appeared that Congress was "aware" of the administrative interpretation only "in a technical sense." 176 U.S.App.D.C. at ——, 538 F.2d at 362. We are not presented with that situation. Not only was the Agency's interpretation of the Air Quality Act of 1967 as mandating prevention of significant deterioration clearly before the Congress in 1970, but the committee reports contain express language that the principle of nondeterioration was preserved by the Clean Air Act Amendments of 1970.

This sort of express congressional recognition of the implementing agency's statutory construction can be extremely significant in interpreting legislative intent. In *NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974), for instance, the Court found approval of a

---

**31.** "The Committee recognized that because the proposed bill would require a great deal in a short period of time and because the brevity of the provision in existing law has led to uneven and inadequate interpretation, the character of an implementation plan must be specified and the alternative methods of achievement listed. The Committee bill would require that a rigorous time sequence be met in the development of the implementation plan and would provide for the substitution of Secretarial authority if the State plan, or a portion thereof, is inadequate to attain the quality of ambient air established by the nationally promulgated ambient air quality standard." S.Rep. No. 91–1196, 91st Cong., 2d Sess. 12 (1970).

**32.** See note 31 *supra.*

**33.** *See The Concept of Non-Degradation, supra* note 30, at 819:

> The legislative history does support the contention that the principle of non-degradation is implicit in the Clean Air Act. It resolves the vagueness of both the purpose

clause and section 110. Although the history of the 1967 Act conveys an ambiguous picture of the legislative intent, the history of both the 1970 Amendments and the later Implementation Hearings clearly indicates that Congress confronted the complexities of air pollution control and undertook a program designed to prevent the deterioration of clean air.

**34.** *Chisholm v. FCC,* 176 U.S.App.D.C. ——, ——, 538 F.2d 349, 361 (1976):

> We begin by noting that attributing legal significance to Congressional inaction is a dangerous business * * *. The Supreme Court has said that Congressional failure to repudiate particular decisions "frequently betokens unawareness, preoccupation, or paralysis" rather than conscious choice, *Zuber v. Allen,* 396 U.S. 168, 185–86 n. 21, 90 S.Ct. 314, 324, 24 L.Ed.2d 345 (1969), and "affords the most dubious foundation for drawing positive inferences," *United States v. Price,* 361 U.S. 304, 310–11, 80 S.Ct. 326, 330, 4 L.Ed.2d 334 (1960) (Harlan, J.).

long-standing administrative interpretation in Congress' studied inaction:

> In addition to the importance of legislative history, a court may accord great weight to the longstanding interpretation placed on a statute by an agency charged with its administration. This is especially so where Congress has re-enacted the statute without pertinent change. In these circumstances, congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress.

416 U.S. at 274–275, 94 S.Ct. at 1762. The Court reached similar results in *Zemel v. Rusk,* 381 U.S. 1, 11, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965) (administration of Passport Act of 1926); *C.I.R. v. Estate of Noel,* 380 U.S. 678, 682, 85 S.Ct. 1238, 14 L.Ed.2d 159 (1965); *NLRB v. Gullett Gin Co.,* 340 U.S. 361, 365–366, 71 S.Ct. 337, 95 L.Ed. 337 (1951); *Helvering v. R. J. Reynolds Tobacco Co.,* 306 U.S. 110, 114–225, 59 S.Ct. 423, 83 L.Ed. 536 (1939); and *Norwegian Nitrogen Co. v. United States,* 288 U.S. 294, 313, 53 S.Ct. 350, 77 L.Ed.2d 796 (1933), among others.

In the instant case there is every indication that Congress intended in 1970 to continue a policy of prevention of significant deterioration of air quality. In addition, we find nothing in the legislative history to indicate that Congress had any desire or intention that the 1970 amendments hinder the fight against air pollution by voiding the principle of nondeterioration.

It is significant in this regard that recent congressional statements have supported the historic existence of a requirement of nondeterioration. The report of the House Committee on Interstate and Foreign Commerce on the proposed Clean Air Act Amendments of 1976 (H.R.Rep. No. 94–1175, May 15, 1976) endorses a new statuto-

ry definition of nondeterioration, commenting that "[t]he Committee has developed this section to provide clearer definition of the nearly decade-old policy (reflected in section 101(b) of the Act) that significant deterioration of clean air must be avoided, and to provide more specific congressional guidance as to how this policy is to be implemented." *Id.* at 83. A contemporaneous report of the Senate Committee on Public Works on similar proposed amendments has both restated the language quoted above from the 1970 Senate report [35] and reaffirmed the continuing policy of nondeterioration:

> A nondegradation policy was articulated first in Federal water pollution law. That was in 1965. The concept was incorporated into the 1967 Air Quality Act, which stated that a basic purpose of the Act was to "protect and enhance the quality of the Nation's air resources." That language was not altered by the 1970 Clean Air Amendments. This bill clarifies and details that policy.

*Clean Air Amendments of 1976,* S.Rep. No. 94–717 at 20 (March 29, 1976). It would fly in the face of overwhelming evidence of legislative intent to hold that the Clean Air Act does not contain a requirement of prevention of significant deterioration.

Our belief that *Sierra Club v. Ruckelshaus* was decided properly is bolstered by its acceptance in a number of other circuits.[36] Petitioners suggest, however, that the later decision in *Train v. NRDC,* 421 U.S. 60, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975), and enactment of the Energy Supply and Environmental Coordination Act of 1974, 88 Stat. 246, are necessarily inconsistent with the concept of nondeterioration of air quality. We reject both contentions.

■ *Train v. NRDC* involved construction of the "shall approve" language of

---

**35.** See p. 1125 *supra.*

**36.** See *NRDC v. EPA,* 489 F.2d 390, 408 (5th Cir. 1974), *rev'd on other grounds, sub nom. Train v. NRDC,* 421 U.S. 60, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975); *Big Rivers Electric Corp. v. EPA,* 8 ERC 1092 (6th Cir. 1975); *Union Elec-*

*tric Co. v. EPA,* 515 F.2d 206, 220 (8th Cir. 1975), *aff'd on other grounds,* —— U.S. ——, 96 S.Ct. 2518, 49 L.Ed.2d —— (1976); *NRDC v. EPA,* 507 F.2d 905, 913 (9th Cir. 1974). *Cf. Highland Park v. Train,* 519 F.2d 681, 685 (7th Cir. 1975).

Section 110(a)(3)(A),[37] which requires that the Administrator approve revisions of state plans which, after revision, meet the criteria of Section 110(a)(2). The Court held that state action which grants a variance to an individual pollution source must be approved by the Administrator if the approval will not expand the time for compliance with national primary ambient air quality standards [38] or otherwise violate the requirements of Section 110(a)(2). In the following passage, strongly pressed upon us by petitioners, the Court emphasized the mandatory language of Section 110(a)(2):

> The Agency is plainly charged by the Act with the responsibility for setting the national ambient air standards. Just as plainly, however, it is relegated by the Act to a secondary role in the process of determining and enforcing the specific, source-by-source emission limitations which are necessary if the national standards it has set are to be met. Under § 110(a)(2), the Agency is *required* to approve a state plan which provides for the timely attainment and subsequent maintenance of ambient air standards, and which also satisfies that section's other general requirements. The Act gives the Agency no authority to question the wisdom of a State's choices of emission limitations if they are part of a plan which satisfies the standards of § 110(a)(2), and the Agency may devise and promulgate a specific plan of its own only if a State fails to submit an imple-

mentation plan which satisfies those standards.

421 U.S. at 79, 95 S.Ct. at 1481 (emphasis in original).[39] It is argued that this decision removes from the Administrator the discretion to disapprove a plan which complies with Section 110(a)(2), and therefore requires that *Sierra Club v. Ruckelshaus* be overturned. This argument, however, is subject to the same analysis by which we reject the argument based on Section 110(a)(2) alone. Unlike the instant case, *Train* was concerned with air pollution below the national standards, and the question was whether individual variances would prevent the states from achieving the standards within the prescribed time limits. The Supreme Court in *Train* did not consider the issue of nondeterioration, even though the decision below was based in part on *Sierra Club v. Ruckelshaus.*[40] Rather than assume, as the industrial petitioners would have us, that *Train* silently overturned the earlier divided affirmance in *Sierra Club*, we find it more reasonable to conclude that the Court did not address the issue, and we reject the argument based on *Train*.

In another recent decision, *Union Electric Co. v. EPA*, —— U.S. ——, 96 S.Ct. 2518, 49 L.Ed.2d —— (1976), the Supreme Court found challenges to state implementation plans based on economic infeasibility to be barred by the mandatory nature of Section 110(a)(2). The Court found in the legisla-

---

**37.** "The Administrator shall approve any revision of an implementation plan applicable to an air quality control region if he determines that it meets the requirements of paragraph 2 [§ 110(a)(2)] and has been adopted by the State after reasonable notice and public hearings." Section 110(a)(3)(A), 42 U.S.C. § 1857c–5(a)(3)(A) (Supp. IV 1974).

**38.** Section 110(a)(2)(A), 42 U.S.C. § 1857c–5(a)(2)(A) (1970):

The Administrator shall approve such plan, or any portion thereof, if he determines that it was adopted after reasonable notice and hearing and that—

(A)(i) in the case of a plan implementing a national primary ambient air quality standard, it provides for the attainment of such primary standard as expeditiously as practicable but * .* * in no case later than

three years from the date of approval of such plan (or any revision thereof to take account of a revised primary standard); and (ii) in the case of a plan implementing a national secondary ambient air quality standard, it specifies a reasonable time at which such secondary standard will be attained[.]

**39.** The language was repeated in *Hancock v. Train*, —— U.S. ——, ——, 96 S.Ct. 2006, 2008, 48 L.Ed.2d 555, (1976) (dictum), which concerned the obligation of federal facilities to comply with the requirements of state implementation plans.

**40.** *NRDC v. EPA, supra* note 36, 489 F.2d at 408. The *Train* decision was limited expressly to the question of approval of variances. 421 U.S. at 69–70, 95 S.Ct. 1470.

tive history of the 1970 amendments a congressional determination that clean air objectives should take precedence over claims of economic or technological infeasibility:

As we have previously recognized, the 1970 Amendments to the Clean Air Act were a drastic remedy to what was perceived as a serious and otherwise uncheckable problem of air pollution. The Amendments place the primary responsibility for formulating pollution control strategies on the States, but nonetheless subject * * * the States to strict minimum compliance requirements. These requirements are of a "technology-forcing character," *Train v. NRDC,* 421 U.S., at 91 [95 S.Ct. 1470], and are expressly designed to force regulated sources to develop pollution control devices that might at the time appear to be economically or technologically infeasible.

This approach is apparent on the face of § 110(a)(2). The provision sets out eight criteria that an implementation plan must satisfy, and provides that if these criteria are met and if the plan was adopted after reasonable notice and hearing, the Administrator "shall approve" the proposed state plan. The mandatory "shall" makes it quite clear that the Administrator is not to be concerned with factors other than those specified, *Train v. NRDC,* 421 U.S., at 71 n. 11, 79, [95 S.Ct. at 1481], and none of the eight factors appears to permit consideration of technological infeasibility.

—— U.S. at ——, 96 S.Ct. at 2525. Although the Court stressed the "shall approve" language of Section 110(a)(2), its construction was founded on a concern that the congressional mandate of prompt imple-

mentation of pollution control plans not be disserved. The Court was not presented with the distinct question whether the "shall approve" language of Section 110(a)(2) must be read to subvert the concomitant congressional directive that significant deterioration of air cleaner than the national standards be prevented.[41] Thus, despite the emphasis placed on (a)(2) by the opinions in *Train v. NRDC* and *Union Electric,* we do not believe the result in the instant case is controlled by either opinion.

Petitioners also rely on the Energy Supply and Environmental Coordination Act of 1974 (ESECA), which was enacted to encourage stationary fuel-burning sources to convert from oil to coal, to minimize the nation's dependence on imported oil. Among other things, it (1) authorized the Federal Energy Administration to require power plants and other major fuel-burning sources to burn coal, (2) amended the Clean Air Act to provide a limited exemption from stationary source requirements to those converting facilities,[42] and (3) required the Administrator of EPA to review the implementation plan of each state and notify any state which could revise its plan as to stationary fuel-burning sources without violating the national ambient air quality standards.[43] The ESECA is accommodated in the "significant deterioration" regulations by 40 C.F.R. § 52.21(d)(1), which exempts from preconstruction review modifications "to utilize an alternative fuel, or higher sulfur content fuel."

Although conversion to "dirtier" fuels such as coal certainly will impair both improvement and maintenance of air quality, there is no reason to believe that passage of ESECA was intended to eliminate the requirement of nondeterioration.[44] The

---

**41.** As was the case in *Train v. NRDC,* the lower court in *Union Electric* expressly had approved the concept of prevention of significant deterioration. *Union Electric Co. v. EPA, supra* note 36, 515 F.2d at 220 n.39. The Supreme Court affirmed the Court of Appeals without mentioning that issue.

**42.** Section 119, 42 U.S.C. § 1857c–10 (Supp. IV 1974).

**43.** Section 110(a)(3)(B), 42 U.S.C. § 1857c–5(a)(3)(B) (Supp. IV 1974).

**44.** The "purpose" section of ESECA, 15 U.S.C. § 791 (Supp. IV 1974), is as follows:

The purposes of this chapter are (1) to provide for a means to assist in meeting the essential needs of the United States for fuels, *in a manner which is consistent, to the fullest extent practicable, with existing national commitments to protect and improve the environment,* and (2) to provide requirements for reports respecting energy resources. (Emphasis added.)

amendment was a necessary response to the nationwide shortage of oil and natural gas, and no reason has been presented for ascribing to it a greater significance.[45]

We therefore find no substantial reason to question, under ESECA or *Train*, the continuing validity of *Sierra Club v. Ruckelshaus*, and we proceed to the substance of the regulations under review using that decision as our guide.

B. Are the regulations invalid on the ground that only two of the six primary air pollutants are considered?

The regulations provide for control only of particulate matter and sulfur dioxide emissions,[46] whereas the Administrator also has identified carbon monoxide, nitrogen oxides, hydrocarbons, and photochemical oxidents as air pollutants which have an adverse effect on public health or welfare.[47] It is contended that the regulations violate the District Court's order in *Sierra Club v. Ruckelshaus* by failing to prevent significant deterioration of air quality with respect to those four pollutants.[48]

EPA has responded that the interrelationships among those four pollutants, and the relationships between incremental increases in those pollutants and deterioration of air quality, are poorly understood and cannot be determined with any reasonable degree of accuracy:

These [four pollutants] are commonly referred to as "automotive pollutants," because the automobile is the major source of each of them * * *. The first three (HC, $NO_2$, and $O_x$) are also known

as "photochemical" or "reactive" pollutants, because under the influence of sunlight, they enter into a complex chemical reaction in the atmosphere. * * * The rate at which the reaction occurs depends on a number of variables, including temperature, humidity, solar intensity, and the concentrations of the input pollutants. * * *

The chief reason for excluding photochemical pollutants from these regulations is that the relationship between the emission of HC and oxides of nitrogen, on the one hand, and the resulting ambient levels of the harmful pollutants $O_x$ and $NO_2$, on the other, is very poorly understood. The only method for relating emissions to air quality for these pollutants is the "area-wide proportional model." This model assumes, as its name suggests, that ambient pollutant levels are proportional to total emissions. The model is useful only in areas where ambient pollutant levels are substantial and well-monitored, as in urban areas with smog problems. * * * But the proportional model cannot be used to regulate air quality deterioration in clean-air areas. This is because the assumptions underlying the model do not hold in clean-air areas, and also because it is not possible to make accurate measurements of ambient levels of photochemical pollutants that are substantially below the levels of the national standards.

Br. for respondent at 32–33 (footnote omitted), *elucidating*, 39 Fed.Reg. 31006 (August 27, 1974); 39 Fed.Reg. 42511 (December 5, 1974); *Technical Support Document—EPA Regulations for Preventing the Significant*

45. We also reject the argument that it is "unfair" to count the increased emissions from a source that is converted to coal against the allowable pollution increment for the area, since that modification is exempted from preconstruction review. We see no reason why a state in which major utilities have been forced to convert to coal may not choose to impose commensurately stricter standards on the remainder of the area.

46. *See* note 18 *supra.*

47. 40 C.F.R. §§ 50.8–50.11 (1975).

48. The order required that the Administrator "prepare and publish proposed regulations, pursuant to 42 U.S.C. § 1857c–5(c), as to any state plan which he finds, on the basis of his review, either permits the significant deterioration of existing air quality in any portion of any state or fails to take the measures necessary to prevent such significant deterioration." *Sierra Club v. Ruckelshaus*, Civil Action No. 1031–72 (D.D.C. May 30, 1972).

*Deterioration of Air Quality,* U.S. Environmental Protection Agency, Office of Air Quality Planning and Standards (January 1975), at 21–27 (JA 117–123). EPA concluded that existing technology "is inappropriate for analyzing the incremental impact of individual new sources" with respect to the four "automotive pollutants," and that "[a]t this time, the only practical approach for dealing with these pollutants appears to be to minimize emissions as much as possible." 39 Fed.Reg. 42511 (December 5, 1974). EPA further has contended that ongoing programs toward reduction of automotive emissions "are adequate to prevent any significant deterioration due to sources of carbon monoxide, hydrocarbons or nitrogen oxides."[49]

■ Petitioners have emphasized that the four omitted pollutants can have extremely adverse effects on public health and welfare, and have noted that they are emitted by stationary sources as well as by moving vehicles. Petitioners have not, however, directly clashed with EPA's contention that it does not have technology or modeling techniques rationally to regulate emissions on a case-by-case basis. This is the type of policy decision in which the Agency's developed expertise is heavily implicated, and with which the court will not tamper so long as the decision was rational and based on consideration of the relevant factors. *Ethyl Corp. v. EPA, supra,* 176 U.S.App.D.C. at —— ——, 541 F.2d at 33–37. Given the absence of any direct denials of EPA's assertions on this point, the Agency is entitled to claim the presumption of validity which attends its actions. *Id.,* slip op. at 68. We therefore hold that EPA did not act unlawfully in excluding from its regulations the four "automotive pollutants."

C. Are Class II and Class III invalid as permitting significant deterioration of air quality?

D. It is unlawful to make determinations as to permissible air quality deterioration on the basis of considerations other than air quality?

■ It is argued by Sierra Club that Classes II and III, by permitting increases in sulfur dioxide and particulate matter pollution to levels which in some areas may be many times present concentrations, allow significant deterioration of air quality. The "significance" is primarily a matter of the numbers involved; although evidence has been presented that levels of pollution below the national secondary standards may have adverse health effects,[50] it is for the Administrator rather than the courts to determine that the national secondary standards no longer can be said to protect the public from "any known or anticipated adverse effects" of a pollutant. The question of significance thus leads by implication to a second line of argument—that it is unlawful to consider deterioration of air quality "insignificant" simply because it accompanies normal, controlled economic development.

EPA recognized, in developing the concept of "significant deterioration" pursuant to Judge Pratt's order that "[p]ending the development of adequate scientific data on the kind and extent of adverse effects of air pollutant levels below the secondary standards, significant deterioration must necessarily be defined without a direct quantitative relationship to specific adverse effects on public health and welfare." 39 Fed.Reg. 18987 (July 16, 1973). It therefore determined that each state must determine what level of incremental pollution, taking into account the air quality and social and economic needs and objectives of the area,

---

**49.** 39 Fed.Reg. 31006 (Aug. 27, 1974).

**50.** Br. for petitioners Sierra Club *et al.,* No. 74–2063, at 18–20. *See also Clean Air Act Amendments of 1976,* Report of the Senate Committee on Public Works, S.Rep.No.94–717 at 19–27 (March 29, 1976); *Clean Air Act Amendments of 1976,* Report of the House Committee on Interstate and Foreign Commerce, H.R.Rep.No.94–1175 at 83–116 (May 15, 1976).

would be "significant deterioration" of its air quality.[51]

█ In that context, it was a rational policy decision that the significance of deterioration of air quality should be determined by a qualitative balancing of clean air considerations against the competing demands of economic growth, population expansion, and development of alternative sources of energy. The approach provides a workable definition of significant deterioration which neither stifles necessary economic development nor permits unregulated deterioration to the national standards.[52] We therefore find that EPA acted within the discretion it is granted as to matters of policy[53] in choosing this design to prevent significant deterioration of air quality.

We may state our belief, as a general overview at this point, that for the most part it somewhat misses the mark to raise objections to the specific emission limits of the regulations under review. EPA has emphasized that the individual states are free to conceive and adopt their own methods of preventing significant deterioration. A state may use EPA's system to classify itself as industrial-metropolitan (Class III), as anticipating normal economic growth (II), or as desirous of protecting its clean air (I). But it also may develop its own scheme, based on its own needs, so long as

the regulatory structure prevents significant deterioration of air cleaner than the national standards. Given the broad power vested in the states to alter or amend these regulations, we find little merit in objections to the specifics of the classification scheme itself.

E. Has the effective date of the regulations been postponed unlawfully beyond the date contemplated by the Clean Air Act?

The Clean Air Act of 1970 imposed a series of time limits for the various steps leading up to approval of state implementation plans. Under that timetable regulations should have become effective by the middle of 1972.[54]

The regulations employ two later effective dates. First, emissions increments are measured from a January 1, 1975 baseline, and all sources for which "approval" is given after that date will have their emissions counted against the allowable increment for the region. 40 C.F.R. § 52.21(d)(2)(i) (1975). Second, preconstruction review is provided only for sources which have "not commenced construction or modification prior to June 1, 1975." 40 C.F.R. § 52.21(d)(1) (1975). " 'Commenced' means that an owner or operator has undertaken a continuous program of construction or modification or that an owner or operator has entered into

---

51. *See* pp. 1121–1122 *supra.*

52. EPA acknowledges that all states theoretically could reclassify to Class III, thereby permitting unregulated deterioration to the national standards. It asks that the states not "arbitrarily and capriciously" disregard its outlined considerations before redesignating areas. 40 C.F.R. § 52.21(c)(3)(vi)(a).

53. "However formal the type of agency proceeding, an agency's policy choices are reviewed under the arbitrary and capricious standard, which asks merely whether the policy choice is rationally connected to its factual basis." *Judicial Review of the Facts in Informal Rulemaking: A Proposed Standard,* 84 Yale L.J. 1750, 1751 (1975).

54. The Clean Air Act Amendments of 1970 were added on Dec. 31, 1970, 84 Stat. 1677. The Administrator was given 90 days in which to propose and promulgate national primary and secondary ambient air quality standards. Section 109(a)(1)(B), 42 U.S.C. § 1857c–4(a)(1)(B). The states then were given nine months to submit proposed implementation plans to the Administrator, § 110(a)(1), 42 U.S.C. § 1857c–5(a)(1), and the Administrator had four months to approve or disapprove the plans. Section 110(a)(2), 42 U.S.C. § 1857c–5(a)(2). The Administrator was to "promptly prepare and publish" implementation plans for states which failed to submit a complying plan or which failed to revise a plan after 60 days notice. Section 110(c), 42 U.S.C. § 1857c–5(c). The target date for effectiveness of state implementation plans was therefore mid-1972.

a contractual obligation to undertake and complete, within a reasonable time, a continuous program of construction or modification." 40 C.F.R. § 52.21(b)(7) (1975). Compare 40 C.F.R. § 52.01(b) (1975). All later-commenced source construction must be reviewed for compliance with new source performance standards and for a determination that construction will not cause the pollution increments of any area to be violated. 40 C.F.R. § 52.21(d)(2) (1975), as amended, 40 Fed.Reg. 42011 (September 10, 1975).

■■■ We are asked to hold that sources for which construction was commenced after mid-1972 must be counted against the allowable pollution increments for the various regions. EPA answers that inclusion of the earlier construction would limit practical use of the regulations to regulate future development. We accept the latter position. Whatever the effect of past construction has been upon present pollution, each state must determine what will be appropriate for future air quality and economic development. So long as any state may choose to limit future development to compensate for excessive past pollution, the choice of starting dates for the applicability of the regulations appears to be irrelevant.[55] For the same reason we do not believe EPA acted unreasonably in failing to count increases in pollution since 1972 against the allowable increments. It was a rational policy decision to limit the instant regulations to prospective concerns only.

F. Is it arbitrary and capricious to review proposed construction of stationary sources on the basis of compliance with the New Source Performance Standards, rather than on the basis of Best Available Control Technology on a case-by-case basis?

G. Was the Administrator required to provide for preconstruction review of all sources, rather than for "significant" sources only?

40 C.F.R. § 52.21(d)(ii) (1975) requires that new sources which are subject to preconstruction review meet the level of emissions that would be achieved by application of the Best Available Control Technology (BACT); Section 52.01(f) defines BACT as equivalent to the New Source Performance Standards (NSPS) promulgated under Section 111 of the Clean Air Act, 42 U.S.C. § 1857c-6 (1970), amended (Supp. IV 1974), when those standards are available. If no NSPS has been established for a category of sources, preconstruction review of emission reduction systems is done on a case-by-case basis. 40 C.F.R. §§ 52.21(d)(2)(ii), 52.-01(f) (1975). The Sierra Club posits that the NSPS guidelines, defined by Section 111 as "the degree of emission limitation achievable through the application of the best system of emission reduction which (taking into account the cost of achieving such reduction) the Administrator determines has been adequately demonstrated," are a "lowest common denominator"-based group and are inconsistent with the policy of nondeterioration.

■■■ We accept EPA's response that case-by-case review of all new sources would not only be unworkable, but would undermine Section 111 by limiting its application of NSPS to those areas which have not yet achieved the national secondary standards. It appears, in addition, that application of NSPS rather than BACT will not of necessity lead to more total pollution; a given area still is limited to the specified increment for its classification, and the use of a less effective emission reduction system by one new statutory source will simply use up more of the allow-

---

55. Similarly, we find no ground for objection to the manner in which EPA has defined commencement of construction. 40 C.F.R. § 52.-21(b)(7) (1975). Even if a source on which construction has "commenced" is not subject to preconstruction review, its emissions may be considered in choosing the appropriate pollution increment to be applied to the area.

able increment and limit opportunities for other proposed new sources. This trade-off, between types of control systems and opportunities for new source construction, is best left to the states, which by delegation will administer the preconstruction review. As the Supreme Court held in *Train v. NRDC, supra,* "so long as the ultimate effect of a State's choice of emission limitations is compliance with the national standards for ambient air, the State is at liberty to adopt whatever mix of emission limitations it deems best suited to its particular situation." 421 U.S. at 79, 95 S.Ct. at 1482. We therefore hold that the use of NSPS is rational and in accord with the Clean Air Act.

■ An additional challenge to the procedures for preconstruction review is based on the allegedly unlawful limitation of review to 19 specified categories of sources.[56] We find this argument subject to the analysis presented above with respect to use of NSPS rather than BACT. Review of every new source of pollution clearly would be impossible since every gas- or oil-heated house is a source of some pollution. The decision to review only those sources which emit more than 25 pounds per hour of sulfur dioxide or particulate matter [57] does not mean there will of necessity be more total pollution; it means only that a large number of minor sources could use up the area's allowable increment and thereby preclude construction of new major sources of pollution. As EPA stated in a document explaining its regulations:

The 18 categories which are covered by the regulation, except for fuel conversion plants, are the largest present emitters of $SO_2$ and TSP on a nationwide basis. Fuel conversion plants (coal gasification and liquefication, oil shale processing, etc.) were included due to their significant growth potential, particularly in presently clean areas * * *. The air quality impact of sources not included in the 18 categories is taken into account since the total air quality deterioration above the baseline is taken into account when an application to construct a new source of one of the 18 categories is reviewed.

*Technical Support Document—EPA Regulations for Preventing the Significant Deteri-*

---

**56.** The 19 listed categories are:

(i) Fossil-Fuel Steam Electric Plants of more than 1000 million B.T.U. per hour heat input.
(ii) Coal Cleaning Plants.
(iii) Kraft Pulp Mills.
(iv) Portland Cement Plants.
(v) Primary Zinc Smelters.
(vi) Iron and Steel Mills.
(vii) Primary Aluminum Ore Reduction Plants.
(viii) Primary Copper Smelters.
(ix) Municipal Incinerators capable of charging more than 250 tons of refuse per 24 hour day.
(x) Sulfuric Acid Plants.
(xi) Petroleum Refineries.
(xii) Lime Plants.
(xiii) Phosphate Rock Processing Plants.
(xiv) By-Product Coke Oven Batteries.
(xv) Sulfur Recovery Plants.
(xvi) Carbon Black Plants (furnace process).
(xvii) Primary Lead Smelters.
(xviii) Fuel Conversion Plants.
(xix) Ferroalloy production facilities commencing construction after October 5, 1975.

40 C.F.R. § 52.21(d)(1)(i)–(xix) (1975), *as amended,* 40 Fed.Reg. 42011 (Sept. 10, 1975).

**57.** The standard of 25 pounds/hour of emissions for addition of new categories to the list of those subject to preconstruction review was proposed on June 9, 1975 (40 Fed.Reg. 24534) and adopted Sept. 10, 1975 (40 Fed.Reg. 42011):

[T]he criteria the Administrator intends to use in adding further sources in the future * * * are:

(1) a new source performance standard for sulfur dioxide (SO2) or particulate matter has been established for the source or any facility of the source under Part 60 of this chapter, and (2) the established new source performance standard will allow any anticipated future plant affected by the standard to emit SO2 or particulate matter in excess of 25 pounds per hour from the affected facility or facilities when operating at maximum design capacity.

The later notice also added the 19th category, Ferroalloy production facilities.

*oration of Air Quality*, U.S. Environmental Protection Agency, Office of Air Quality Planning & Standards (January 1975), at 27–28. Further, it is within the power of the various states to enact more stringent controls, and expanded preconstruction review procedures, should limited review lead to problems in regulating incremental pollution. We therefore hold that the regulations are not invalid insofar as provision is made for preconstruction review of only the specified categories of stationary sources.

H. Are the regulations arbitrary and capricious on the ground that the allowable increments are unrelated to anticipated adverse effects on public health and welfare?

█ The regulations under review establish a classification scheme which is not based on demonstrated adverse air quality effects, but rather on a balancing of concerns with air quality, economic and social needs and objectives, and development of energy sources. The industrial petitioners contend that EPA is not authorized to promulgate regulations which are not related to adverse air quality effects, and that Classes I and II therefore are invalid.

The need to prevent significant deterioration of air cleaner than the national standard

therefor, was settled by the *Sierra Club v. Ruckelshaus* litigation. It clearly is a rational legislative purpose to protect and enhance the quality of the nation's air, even in the absence of quantified evidence of adverse effects.[58]

The District Court order in *Sierra Club v. Ruckelshaus* mandated that EPA enforce this legislative purpose by preventing significant deterioration of air quality, but left definition of "significant" to the Agency. EPA's solution was a definition created by its own implementation; each state's evaluation of the relative importance of the competing interests which surround continued maintenance of air quality will determine what level of deterioration would be significant for that state. The three classifications thus are not intended to represent a scientific conclusion as to what constitutes significant deterioration; rather, they are suggested frameworks for use by the states after independent evaluation. Because the regulations do not purport to be mandatory requirements based on scientific research, they properly cannot be judged by asking whether the increments are related to demonstrated health effects. As we have noted above, any state could adopt even more stringent regulations by proposing its own revision to its implementation plan.[59]

---

**58.** EPA emphasized in promulgating regulations that levels of pollution below the national standards still may have some adverse effects:

Limitations on air quality that result in cleaner air than the national ambient air quality standards cannot * * * be based on any quantitative measure of harm to either public health or welfare. This is not, however, to say that there are no possible unquantified adverse effects on public health or welfare below the levels of the national standards. Examples of such unquantified effects involve the transformation of sulfur dioxide into suspended sulfates and sulfuric acid aerosols, resulting in possible effects on health, visibility, climatic changes, acidity of rain, and deterioration of materials.

Since there is no way to relate "significance" of deterioration of air quality to any adverse effects resulting from air quality levels cleaner than the national standards, EPA

concluded that the determination of what is "significant" deterioration must take into account factors other than air quality alone. For example, relatively minor deterioration of the aesthetic quality of the air may be very significant in a recreational area in which great pride (and economic development) is derived from the "clean air."

*Technical Support Document—EPA Regulations for Preventing the Significant Deterioration of Air Quality*, U.S. Environmental Protection Agency, Office of Air Quality Planning & Standards (January 1975), at 6. *See also Clean Air Act Amendments of 1976*, Report of the Senate Committee on Public Works, S.Rep. No. 94–717 at 19–27 (March 29, 1976); *Clean Air Act Amendments of 1976*, Report of the House Committee on Interstate and Foreign Commerce, H.R.Rep.No.94–1175 at 83–116 (May 15, 1976).

**59.** *See* p. 1123 *supra*.

We therefore find insubstantial the objection that the varying allowable increments presented in the instant regulations are unrelated to demonstrated adverse health effects. The regulations flow from a valid legislative goal, and we believe EPA has acted reasonably in permitting each state, in its informed discretion, to develop a workable definition of significant deterioration.

I. Are the regulations unworkable because present modeling techniques are inadequate to predict precisely how a new source will affect the ambient air?

Some petitioners [60] have objected that present computer modeling technology is inadequate to predict with precision what effect a proposed new source will have on the ambient air, and therefore on the allowable increment for a given region. EPA does not dispute the point as to the accuracy of existing techniques, but does argue that present diffusion modeling techniques, "while not corresponding to actual conditions in the ambient air, do provide a consistent and reproducible guide which can be used in comparing the relative impact of a source." 39 Fed.Reg. 31003 (August 27, 1974). So long as the method of measurement is consistent, it may be used as a reliable benchmark of the relative impact of different sources; EPA argues that it therefore is unnecessary to be able to guarantee with precision what effect a source will have.

We have no basis on which to question EPA's judgment as to its predictive techniques. Any consistent method of prediction can be adjusted in light of actual experience, and a state therefore may adjust its guidelines for future development on the basis of changes in the measured pollution levels over time. We cannot hold at this time, therefore, that lack of precision alone

is a substantial objection to the methods which may be used to estimate the impact of a proposed source on actual levels of pollution.

J. Did EPA violate the Clean Air Act

(1) by not permitting submission of revised plans before promulgating regulations, or

(2) by not holding hearings in each state before promulgating the regulations?

The Administrator is required to prepare and publish his own implementation plan, or portion thereof, for a state if (a) the state fails to submit a plan as to any national standard, (b) the plan is not in accordance with the requirements of Section 110 of the Act, or (c) the state fails, within 60 days, to revise its plan pursuant to Section 110(a)(2)(H), which requires that implementation plans provide for revisions (i) to take account of changes in technology or (ii) if the Administrator determines that the plan is inadequate to achieve the primary or secondary standards. Section 110(c)(1), 42 U.S.C. § 1857c-5(c)(1) (Supp. IV 1974). Subsection (c)(1) also contains a hearing requirement; if a state did not hold a public hearing with respect to the plan or revision being promulgated, the Administrator must provide a hearing within the state. The Administrator is to promulgate his regulations within six months, unless within that time the state has adopted and submitted an implementation plan which is in accord with the requirements of Section 110. *Id.*

It is contended that the instant regulations, which amended the implementation plans of all states,[61] constituted a "revision" under Section 110(a)(2)(H). Under Section 110(c)(1)(C) the Administrator may promul-

---

**60.** *See, e. g.*, Br. of American Petroleum Institute *et al.* in No. 75-1665 at 38.

**61.** *See* note 9 *supra.*

gate new regulations only if a state fails, after 60 days, to submit the required (a)(2)(H) revision. Further, if the regulations are considered "revisions," it is claimed, the Administrator was required by Section 110(c)(1) to hold a hearing in each state before promulgating the regulations.

The original order of the District Court required that the "Administrator * * * prepare and publish proposed regulations, pursuant to 42 U.S.C. § 1857c–5(c), as to any state plan which he finds, on the basis of his review, either permits the significant deterioration of existing air quality in any portion of any state or fails to take the measures necessary to prevent such significant deterioration. Such regulations shall be promulgated within six months of this order." *Sierra Club v. Ruckelshaus*, Civil Action No. 1031–72 (D.D.C. May 30, 1972). That order—which was affirmed by this court and the Supreme Court—clearly did not contemplate that a hearing be held in each state prior to promulgation of regulations, nor did it require that the states be given a prior opportunity to revise their plans. We reaffirm the order in both respects.

All states had held public hearings on their proposed implementation plans before the District Court order was entered.[62] After disapproving all state plans insofar as they failed to prevent significant deterioration,[63] the Administrator held five regional hearings in Washington, Atlanta, Dallas, Denver, and San Francisco on proposed regulations,[64] and solicited written comments.[65] We believe that procedure was sufficient in the circumstances presented. Unfortunately, the requirement of prevention of significant deterioration does not fit neatly into the statutory scheme, as it is not expressly included in Section 110 of the Act. The Administrator's disapproval of all plans pursuant to the District Court order, and the subsequent promulgation of regulations, were required by Section 101 of the Act and by the legislative history, but were not within the defined processes of Section 110(c). Implementation of the District Court order required an exercise of discretion by the Administrator, and we find that he acted well within that discretion by concluding that only regional hearings were necessary to supplement the hearings which had already been held in all states.

In making this decision we wish to emphasize, first, that petitioners have not alleged with any specificity how they were harmed by the lack of individual state hearings. We are presented only with a generalized statutory claim,[66] which apparently never was raised before the Agency. Second, it should be remembered that the states arguably have been denied no rights by promulgation of the nondeterioration regulations. They remain free, after public hearing, to develop their own regulatory scheme to supplant that promulgated by EPA, so long as the substitute prevents significant deterioration of air quality.[67] We cannot conclude, then, that the regulations are defective on procedural grounds.

---

62. In its initial approval and disapproval of state plans, published May 31, 1972 (37 Fed. Reg. 10842), EPA noted that all states had held hearings and had submitted implementation plans.

63. 37 Fed.Reg. 23836 (Nov. 9, 1972).

64. *See* 39 Fed.Reg. 31000 (Aug. 27, 1974).

65. *Id.*

66. *Cf. American Airlines, Inc. v. CAB*, 123 U.S. App.D.C. 310, 318–319, 359 F.2d 624, 632–633, cert. denied, 385 U.S. 843, 87 S.Ct. 73, 17 L.Ed.2d 75 (1966):

   [T]here is no basis on the present record for concluding that additional procedures were requisite for fair hearing. We might view the case differently if we were not confronted solely with a broad conceptual demand for an adjudicatory-type proceeding, which is at least consistent with, though we do not say it is attributable to, a desire for protracted delay. 'Nowhere in the record is there any specific proffer by petitioners as to the subjects they believed required oral hearings, what kind of facts they proposed to adduce, and by what witnesses, etc. * * *

   *See also United States v. L. A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 73 S.Ct. 67, 97 L.Ed. 54 (1952).

67. *See* p. 1123 *supra*.

K. By providing for reclassification of federal and Indian lands independent of state action, do the regulations abrogate authority granted to the states by the Clean Air Act?

Federal land managers and Indian governing bodies are authorized to propose redesignation of their lands, after consultation with officials of other affected areas and compliance with procedural and hearing requirements. 40 C.F.R. § 52.21(c)(3) (1975).[68] The industrial petitioners and the petitioning state governments object that this authority violates the delegation to the states of authority over air quality within their boundaries in Section 101(a)(3), 42 U.S.C. § 1857(a)(3),[69] and Section 107(a), 42 U.S.C. § 1857c–2(a),[70] that it contradicts the submission of federal facilities to state regulation in Section 118, 42 U.S.C. § 1857f,[71] and that the authority to redesignate gives these lands tremendous practical power over neighboring areas which might be hindered in their development because of designation of federal or Indian lands as Class I areas.[72]

EPA has responded that federal land managers and Indian governing bodies have an important legal interest in protecting the air quality of their lands, that redesignation may not be proposed without consultation with officials of the affected states,[73] and that the Administrator may disapprove redesignation if arbitrary and capricious disregard of the interests of other affected areas is demonstrated.[74] With regard to submission of federal facilities to state regulation, EPA notes that federal lands may be redesignated only to a more restrictive classification than that applicable to the entire state,[75] and thus cannot contribute to unwanted deterioration of air quality.

**68.** *See* p. 1122 *supra.*

**69.** 42 U.S.C. § 1857(a)(3) (1970):
(a) The Congress finds—
    *     *     *     *     *     *
(3) that the prevention and control of air pollution at its source is the primary responsibility of States and local governments[.]

**70.** 42 U.S.C. § 1857c–2(a) (1970):
Each State shall have the primary responsibility for assuring air quality within the entire geographic area comprising such State by submitting an implementation plan for such State which will specify the manner in which national primary and secondary ambient air quality standards will be achieved and maintained within each air quality control region in such State.

**71.** 42 U.S.C. § 1857f (1970):
Each department, agency, and instrumentality of the executive, legislative, and judicial branches of the Federal Government (1) having jurisdiction over any property or facility, or (2) engaged in any activity resulting, or which may result, in the discharge of air pollutants, shall comply with Federal, State, interstate, and local requirements respecting control and abatement of air pollution to the same extent that any person is subject to such requirements. The President may exempt any emission source of any department, agency, or instrumentality in the executive branch from compliance with such a requirement if he determines it to be in the paramount interest of the United States to do so * * *.

**72.** *See* 39 Fed.Reg. 42512 (Dec. 5, 1974):
Under the regulations promulgated below, a source could not be allowed to construct if it would violate an air quality increment either in the area where the source is to be located or in any neighboring area in the State. Therefore, wherever a Class I area adjoins a Class II or III area, the potential growth restrictions, especially for power plant development, extends [*sic*] well beyond the Class I boundaries into the adjacent area. A similar situation exists, to a greater or lesser degree, wherever areas of different classification adjoin each other. Therefore, the area with the less restrictive classification should include an additional area at the periphery where it is clearly recognized that development will be somewhat restricted due to the adjacent "cleaner" area. As a result, a Class I redesignation could be fairly limited in size, yet the adjoining Class II or Class III areas would need to cover a substantial area in order to fully utilize the Class II or III increment. Again, it should be clear that the Class II or III increment could only be fully utilized toward the center of the area and that at the periphery, allowable deterioration will be dictated by the adjoining Class I area rather than the Class II or III increment.

**73.** 40 C.F.R. § 52.21(c)(3)(iv), (v) (1975).

**74.** 40 C.F.R. § 52.21(c)(3)(vi)(*b*), (*c*) (1975).

**75.** 40 C.F.R. § 52.21(c)(3)(iv) (1975).

■ We pretermit this question as we find that the issue is not yet ripe for review.[76] No federal or Indian land has yet been redesignated, and to that extent we cannot be certain how a conflict may evolve. If the Administrator were to approve, as replacements for these regulations, individual state plans which did not include the powers granted to federal land managers and Indian governing bodies, the problems foreseen by petitioners might never arise.

We note that reservation of power to federal land managers and Indian governing bodies should have no effect on present conduct; there appears to be no reason why economic development of any area should be hindered by the possibility that a nearby area may be redesignated in the future to a more restrictive classification. We therefore do not foresee any irreparable injury which may arise from deferral of this question until it arises in a more concrete context.

### L. Are the regulations constitutional?

■ We find the arguments challenging the constitutionality of the nondeterioration regulations to be insubstantial. Regulation of air pollution clearly is within the power of the federal government under the commerce clause.[77] and we can see no basis on which to distinguish deterioration of air cleaner than national standards from pollution in other contexts.[78] Nor do we agree that the regulations bear no rational relationship to protection of public health and welfare and therefore violate the due process clause of the Fifth Amendment. There is a rational relationship between air quality deterioration and the public health and welfare,[79] and there is a proper legislative purpose [80] in prevention of significant

**76.** *See Toilet Goods Ass'n Inc. v. Gardner,* 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967), in which cosmetic manufacturers had brought a pre-enforcement action to challenge the authority of the Commissioner of Food and Drugs to issue regulations under the Color Additive Amendments to the Federal Food, Drug, and Cosmetic Act. The regulation at issue authorized the Commissioner to suspend certification service to any person who denied the FDA free access to manufacturing information. Although the issue was purely legal, the Court found that, as framed, it was not appropriate for judicial resolution:

> The regulation serves notice only that the Commissioner *may* under certain circumstances order inspection of certain facilities and data, and that further certification of additives *may* be refused to those who decline to permit a duly authorized inspection until they have complied in that regard. At this juncture we have no idea whether or when such an inspection will be ordered and what reasons the Commissioner will give to justify his order. The statutory authority asserted for the regulation is the power to promulgate regulations "for the efficient enforcement" of the Act, § 701(a). Whether the regulation is justified thus depends not only, as petitioners appear to suggest, on whether Congress refused to include a specific section of the Act authorizing such inspections, although this factor is sure to be a highly relevant one, but also on whether the statutory scheme as a whole justified promulgation of the regulation. * * * This will depend not merely on an inquiry into statutory purpose, but concurrently on an

understanding of what types of enforcement problems are encountered by the FDA, the need for various sorts of supervision in order to effectuate the goals of the Act, and the safeguards devised to protect legitimate trade secrets * * *. We believe that judicial appraisal of these factors is likely to stand on a much surer footing in the context of a specific application of this regulation than could be the case in the framework of the generalized challenge made here.

387 U.S. at 163–164, 87 S.Ct. at 1524 (emphasis in original).

**77.** *See District of Columbia v. Train,* 172 U.S. App.D.C. 311, 328, 521 F.2d 971, 988 (1975); *Pennsylvania v. EPA,* 500 F.2d 246, 259 (3d Cir. 1974); *South Terminal Corp. v. EPA,* 504 F.2d 646, 677 (1st Cir. 1974).

**78.** Indeed, the vigorous objections that have been mounted against redesignation of federal lands or Indian lands are based on recognition that a pollution source can have air quality effects over a large area.

**79.** *See* note 58 *supra.*

**80.** *See Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241, 258–259, 85 S.Ct. 348, 358, 13 L.Ed.2d 258 (1964), in which the Court held the Civil Rights Act of 1964 to be a valid exercise of congressional power under the commerce clause, and found the Act not barred by the Fifth Amendment:

> Nor does the Act deprive appellant of liberty or property under the Fifth Amendment. The commerce power invoked here by the Congress is a specific and plenary one autho-

deterioration of air quality. Neither can the regulations be construed as an unconstitutional "taking" under the Fifth Amendment, any more than existing emission control regulations represent such a "taking."[81] The use of private land certainly is limited, but the limitation is not so extreme as to represent an appropriation of the land.

The Tenth Amendment is not implicated either by infringement on the reserved powers of the states, *cf. National League of Cities v. Usery,* —— U.S. ——, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), or by any requirement of affirmative action, as in *District of Columbia v. Train,* 172 U.S.App. D.C. 311, 521 F.2d 971 (1975). The states retain broad discretion under the regulations to control the use of their land and the scope of their economic development, and are required to take no affirmative action. Preconstruction review under the regulations is conducted by the Administrator unless a state requests that responsibility be delegated to it. 40 C.F.R. § 52.21(d), (f) (1975).

Last, we find no merit to the argument that the congressional delegation of authority to EPA is unconstitutionally vague. There is substantial basis for the instant regulations in both the Clean Air Act and its legislative history, and we find the regulations to be a reasonable means of implementing the congressional intent.[82] *See South Terminal Corp. v. EPA,* 504 F.2d 646, 676–677 (1st Cir. 1974).

## VI. CONCLUSION

We find no ground on which to disturb the regulations under review, and we therefore affirm the EPA "Prevention of Significant Air Quality Deterioration" regulations.[83] Our review of *Sierra Club v. Ruckelshaus* and subsequent events has revealed no substantial reason for rejection of that decision, and we hold that the nondeterioration regulations promulgated pursu-

rized by the Constitution itself. The only questions are: (1) whether Congress had a rational basis for finding that racial discrimination by motels affected commerce, and (2) if it had such a basis, whether the means it selected to eliminate that evil are reasonable and appropriate. \* \* \*

See also *Nebbia v. New York,* 291 U.S. 502, 537, 54 S.Ct. 505, 78 L.Ed. 940 (1934) (Fourteenth Amendment).

**81.** See *South Terminal Corp. v. EPA,* 504 F.2d 646, 678 (1st Cir. 1974), in which the court upheld a transportation control plan which mandated a 40% reduction in available off-street parking spaces:

[T]he Government has not taken title to the spaces, and the decision about alternative uses of the space has been left to the owner. The takings clause is ordinarily not offended by regulation of uses, even though the regulation may severely or even drastically affect the value of the land or real property. If the highest-valued use of the property is forbidden by regulations of general applicability, no taking has occurred so long as other lower-valued, reasonable uses are left to the property's owner. \* \* \*

**82.** In *Lichter v. United States,* 334 U.S. 742, 785, 68 S.Ct. 1294, 1316, 92 L.Ed. 1694 (1947), the Court upheld a congressional grant of authority to the Secretary of War, the Secretary of the Navy, and the Chairman of the Maritime Commission to renegotiate contracts and to recover "excessive profits." The Court applied the following reasoning to the claim that the term "excessive profits" was unconstitutionally vague:

It is not necessary that Congress supply administrative officials with a specific formula for their guidance in a field where flexibility and the adaptation of the congressional policy to infinitely variable conditions constitute the essence of the program. "If Congress shall lay down by legislative act an intelligible principle . . . such legislative action is not a forbidden delegation of legislative power." *Hampton Co. v. United States,* 276 U.S. 394, 409, 48 S.Ct. 348, 72 L.Ed. 624. Standards prescribed by Congress are to be read in the light of the conditions to which they are to be applied. "They derive much meaningful content from the purpose of the Act, its factual background and the statutory context in which they appear." *American Power & Light Co. v. S. E. C.,* 329 U.S. 90, 104, 67 S.Ct. 133, 141, 91 L.Ed. 103. \* \* \*

**83.** As noted above, see p. 1139, we do not decide the question whether reclassification of federal and Indian lands independent of state action may be unlawful.

ant to that decision are both rational and in accordance with law.

*Affirmed.*

WILKEY, Circuit Judge, concurs in the result only.